# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Friends of the Panamint Valley, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | **Civ. No. 1:06cv1560 (JDB)** |
| | ) | |
| v. | ) | |
| | ) | |
| Dirk Kempthorne *et al*., | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| National Parks Conservation Association | ) | |
| 1300 19th Street N.W. | ) | |
| Washington, D.C. 20035 | ) | |
| | ) | |
| Center for Biological Diversity | ) | |
| 1095 Market St., Suite 511 | ) | |
| San Francisco, CA 94103 | ) | |
| | ) | |
| Public Employees for Environmental Responsibility | ) | |
| 2000 P Street, N.W., Suite 240 | ) | |
| Washington, D.C. 20036 | ) | |
| | ) | |
| Sierra Club | ) | |
| 85 Second Street, 2nd Floor | ) | |
| San Francisco, CA 94105 | ) | |
| | ) | |
| California Wilderness Coalition | ) | |
| 1212 Broadway, Suite 1700 | ) | |
| Oakland, CA 94612 | ) | |
| | ) | |
| The Wilderness Society | ) | |
| 1615 M Street N.W. | ) | |
| Washington, D.C. 20036 | ) | |
| | ) | |
| Proposed Defendant-Intervenors | ) | |

## MOTION OF NATIONAL PARKS CONSERVATION ASSOCIATION *ET AL.* FOR LEAVE TO INTERVENE AS DEFENDANTS

National Parks Conservation Association, Center for Biological Diversity, Public Employees for Environmental Responsibility, Sierra Club, California Wilderness Coalition, and The Wilderness Society (collectively, "NPCA") hereby move for leave to intervene as-of-right as defendants in this action pursuant to Fed. R. Civ. P. 24(a)(2).  In the alternative, NPCA requests leave to permissively intervene pursuant to Fed. R. Civ. P. 24(b).  As explained more fully in NPCA's memorandum in support of this motion, submitted herewith, NPCA meets the District of Columbia Circuit's standard for intervention as of right:  (1) its application is timely; (2) NPCA claims an interest relating to the property which is the subject of this action; (3) NPCA's interests may, as a practical matter, be impaired by this litigation; and (4) its interests are not adequately represented by the existing parties.  *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003); Fed. R. Civ. P. 24(a)(2).  A copy of NPCA's proposed answer is attached to this motion, as required by Fed. R. Civ. P. 24(c).

NPCA moves to intervene to represent the interests of its members, whose goals include protecting the natural, biological, and recreational resources of Surprise Canyon from, among other things, the destructive impacts of motorized vehicle use.

Plaintiffs' counsel and counsel for defendants the United States have indicated that they oppose this motion.

Respectfully submitted this 8th day of November, 2006.


_s/ James S. Angell _____
James S. Angell (D.C. Bar # 460285)
Edward B. Zukoski (motion for admission *pro hac vice* filed concurrently)
McCrystie Adams (motion for admission *pro hac vice* filed concurrently)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
Telephone:  (303) 623-9466

Attorneys for Proposed Defendant-Intervenors


Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
1095 Market St., Suite 511
San Francisco, CA 94103
Telephone: (415) 436-9682 x 307
Email: lbelenky@biologicaldiversity.org

Attorneys for Proposed Defendant-Intervenors Center for Biological Diversity, Public
Employees for Environmental Responsibility, and Sierra Club

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of November 2006, I served a true and exact copy of the MOTION OF NATIONAL PARKS CONSERVATION ASSOCIATION *ET AL.* FOR LEAVE TO INTERVENE AS DEFENDANTS together with an accompanying MEMORANDUM IN SUPPORT OF NATIONAL PARK CONSERVATION ASSOCIATION *ET AL.*'S MOTION TO INTERVENE and attached exhibits, a proposed ORDER, and DISCLOSURE OF PROPOSED DEFENDANT-INTERVENORS' CORPORATE AFFILIATIONS AND FINANCIAL INTERESTS on CD and hard copy via first-class pre-paid U.S. Mail to the following:

Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
karen@buddfalen.com
        *Attorney for Plaintiffs*

Guillermo Montero
U.S. Department of Justice, Natural Resources Division
601 D Street, N.W., Room 3529
Washington, D.C. 20004
TEL: (202) 305-0443
FAX: (202) 305-0274
Guillermo.Montero@usdoj.gov
        *Attorney for Defendants*

                                        s/Lynda Lovett

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Friends of the Panamint Valley, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | **Civ. No. 1:06cv1560 (JDB)** |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM IN** |
| Dirk Kempthorne *et al*., | ) | **SUPPORT OF MOTION** |
| | ) | **TO INTERVENE** |
| Defendants, and | ) | |
| | ) | |
| National Parks Conservation | ) | |
| Association *et al.*, | ) | |
| | ) | |
| Proposed Defendant-Intervenors | ) | |
| _____ | ) | |

The National Parks Conservation Association, Center for Biological Diversity, Sierra Club, Public Employees for Environmental Responsibility, California Wilderness Coalition, and The Wilderness Society (collectively, the "Conservation Groups") respectfully request that this Court grant them leave to intervene on behalf of Defendant Dirk Kempthorne *et al.* in this action. As explained below, the Conservation Groups satisfy the requirements for intervention as of right under Rule 24(a) of the Federal Rules of Civil Procedure, as well as the requirements for permissive intervention under Rule 24(b). In particular, through this litigation, Plaintiffs seek to undo part of a 2001 settlement and consent decree negotiated between several of the Conservation Groups and the U.S. Bureau of Land Management (BLM) that currently protects from damaging motor vehicle use a rare desert river corridor within Death Valley National Park and adjacent BLM lands. Counsel for Defendants and Plaintiffs have indicated that they will oppose this motion.

**BACKGROUND**

I.    **APPLICANTS**

The National Parks Conservation Association is a non-profit public interest organization with 325,000 members nationwide, including approximately 50,000 members in the State of California. Exh. 1 at ¶ 6. Founded in 1919, NPCA works to protect and enhance the ecological, historical, cultural, recreational, spiritual, and other benefits that America's National Park System provides. *Id*. at ¶ 3-4. NPCA typically fulfills its mission through public education and outreach, through information gathering and advocacy, and by participating in legislative and administrative processes affecting national park or national monument designations or management decisions. *Id*. at ¶ 5. NPCA has a long-standing interest in the protection of Death Valley National Park, including Surprise Canyon. *Id*. at ¶¶ 6-7.

The Center for Biological Diversity (CBD) is a non-profit organization with more than 25,000 members nationwide. Exh. 2 at ¶ 3. CBD uses science, public education, advocacy, and legal and administrative processes to fulfill its mission to preserve and recover endangered species and their habitats across the western U.S. *Id*. CBD has a long-standing interest in protecting California's desert habitats and the species that depend upon them. *Id*. at ¶¶ 3-4, 9.

The Sierra Club is a nationwide non-profit conservation organization formed in 1892, with more than 150,000 members in California and its national headquarters in San Francisco. Exh. 3 at ¶ 3. The Club's purposes are to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. *Id*. at ¶ 3. The Sierra Club has a long-standing interest in protecting public lands in the California deserts. *Id*. at 4-7.

Public Employees for Environmental Responsibility (PEER) is a national non-profit organization representing current and former federal and state employees of land management, wildlife protection, and pollution control agencies. Exh. 4 at ¶ 3. Because these employees are not always able to critique agency decision-making for risk of disciplinary action or other conflicts with their duties, PEER provides a mechanism to criticize agency decisions on these employees' behalf. *Id*. PEER has chapters throughout the U.S., including California, and has a long-standing interest in protecting public lands in the California desert. *Id*. at ¶¶ 3, 10. As explained below, along with CBD and the Sierra Club, PEER brought a lawsuit against the BLM in March 2000 that resulted in a consent decree requiring BLM to close Surprise Canyon to damaging motor vehicle use unless and until the agency completed environmental analysis required by law.

The California Wilderness Coalition (CWC) is a non-profit organization with approximately 5,000 members in the State of California. Exh. 5 at ¶ 1. Founded in 1976, CWC focuses on protecting the ecological, historical, cultural, recreational, spiritual, and other benefits California's public lands provide. *Id*. at ¶¶ 3-4. CWC typically works to protect California's federal public lands by participating in public administrative processes, advocating for legislative solutions, and by engaging in public education and outreach. *Id*. at ¶ 5.

The Wilderness Society was formed in 1935 and has nearly 205,000 members nationwide, including approximately 30,000 members in California. Exh. 6 at ¶¶ 3, 6. Its mission is to protect America's wilderness and wildlife and to develop a nationwide network of wild lands. *Id*. at ¶ 3. The Wilderness Society pursues public education and outreach and works through administrative and legislative means to fulfill its goal of ensuring that future generations will enjoy the clean air and water, wildlife, beauty and opportunities for recreation and renewal

that pristine forests, rivers, deserts, and mountains provide. *Id*. at ¶¶ 3-5. The Wilderness Society has particularly focused on lands managed by the BLM and National Park Service (NPS) and has been a long-standing advocate for the protection of California's desert lands, including Surprise Canyon. *Id*. at ¶¶ 4-5, 7, 9.

## II.    SURPRISE CANYON

Located in the arid Mojave Desert in southeastern California, Surprise Canyon contains the longest perennial stream in California's Panamint Mountains and lush willows and towering cottonwoods rarely found in the California desert. Exh. 7 at 1, 7. Home to a wide array of rare wildlife species and important riparian habitat, the upper portion of this canyon is located inside Death Valley National Park, while the lower portion is on adjacent BLM land. *Id*.

Congress and federal land management agencies have long recognized Surprise Canyon's special characteristics. In 1980, the BLM designated the canyon an "Area of Critical Environmental Concern," requiring the BLM to make protection of this riparian oasis its highest management priority. Exh. 7 at 2, 10; *see also* 43 U.S.C. §§ 1702(a), 1712(c)(3) (defining "Areas of Critical Environmental Concern"). In 1994, Congress added the upper portion of the canyon to Death Valley National Park and created the 29,180-acre Surprise Canyon Wilderness, one consequence of which was the elimination of motorized use in the canyon.[1] In 2002, based on the "outstandingly remarkable values" of the canyon, including its perennial stream, riparian

---

[1]    Congress omitted a small portion of the canyon bottom from Wilderness designation so that Congress could determine whether continued motorized use was necessary to reach old mining claims. *See* Exh. 10 (Sens. Feinstein and Boxer noting that "recreational off-roading was never the intent of the Surprise Canyon 'cherry stem'" contained in the California Desert Protection Act (CDPA)).

habitat, and rich biodiversity, the BLM designated Surprise Canyon as eligible for Congressional designation under the Wild and Scenic Rivers Act. Exh. 8 at 6, 23; Exh. 9. [2]

Miners allegedly used the canyon for access to patented mining claims in Panamint City, an abandoned ghost town now within Death Valley National Park. Exh. 7 at 2, 10. The route through the canyon, which was frequently washed out by flash floods, has apparently not been used to access these mining claims since at least 1984. Exh. 10. Starting in 1989, however, four-wheel drive enthusiasts created their own route through the canyon – by cutting trees, filling parts of the streambed with rocks, and even winching their jeeps over near-vertical waterfalls. *See* Exh. 7 at 2 (OHV route created in 1989 "by cutting back vegetation and building rock structures up … waterfalls"); *id.* at 10 ("[m]ost vehicles must be winched up and down waterfalls"); Exh. 10 (Surprise Canyon used intermittently for mining until 1984 and extreme off-roading in 1990s). Even after these extreme measures were taken, the route – promoted "as one of the most challenging jeep trails in the United States" by four-wheel drive organizations – was passable only by specially modified jeeps. Exh. 7 at 10-11; Exh. 2 at ¶ 13.

The off-road vehicle use of the canyon, estimated by the BLM in 2001 to be merely 100 vehicles per year, caused significant damage to the wildlife habitat, riparian areas, and water quality in Surprise Canyon over the next decade, including parts of the Surprise Canyon Wilderness. Exh. 7 at 3, 10, 12. The jeeps drove over streambanks and through the streambed, which, according to a BLM analysis, created tire ruts that pooled water, destroyed the stream channel, and caused erosion. Exh. 7 at 5, 7 (BLM concluding that motor vehicle use caused, among other impacts, "soil loss, stream bed alteration, vegetation damage, wilderness trespass,

---

[2]     Congress also recognized that the desert environment in which Surprise Canyon is located is sensitive to damage. *See* 43 U.S.C. § 1781(a)(2) ("the California desert environment is a total ecosystem that is extremely fragile, easily scarred, and slowly healed").

water pollution from oil and gas spills, and sediment discharge"); Exh. 8 at 5 (1.5 miles of jeep

trail located in stream; 2.3 miles traverses riparian vegetation and wetlands); Exh. 4 at ¶ 10

(former BLM employee observing vehicle impacts).  In addition, because the route was so

difficult and required the vehicles to be winched over narrow waterfalls, only about half the jeeps

that attempted the route succeeded.  Exh. 2 at ¶ 13.  Some vehicles attempting the route were

damaged or rolled over, spilling motor oil, gasoline, antifreeze, and other pollutants into the

water.  Exh. 7 at 14; Exh. 4 at ¶ 6.

On March 16, 2000, CBD, the Sierra Club, and PEER – who are among proposed

intervenors here – filed a lawsuit challenging BLM's failure to comply with the Endangered

Species Act (ESA) in connection with its management plan for the California Desert

Conservation Area (which includes Surprise Canyon). *Center for Biological Diversity et al. v.

Bureau of Land Management et al.*, Civ. No. C-00-0927 WHA (JCS) (N.D. Cal.).  On March 20,

2001, the Northern District of California approved a settlement and consent decree requiring the

BLM to consult with U.S. Fish and Wildlife Service on the impacts of its management plan on

imperiled species, as required by the ESA.  *Id.*  (Stipulation and Judgment attached as Exhs. 11

and 12).  At the plaintiffs' insistence, the consent decree also required BLM to prohibit

motorized access in Surprise Canyon through the use of a locked gate until the agency completed

an analysis under the National Environmental Policy Act (NEPA) to determine how access to the

canyon should be managed, and the impacts of various management alternatives.  *Id.*  Exh. 11 at

14 ¶ 46.  The consent decree also provided for access to private property to the inholdings in the

Panamint City ghost town under certain circumstances. *Id.* at 14-15, ¶ 46. Because the BLM has

not yet completed its NEPA analysis, the canyon remains closed.[3]

Since the BLM closed the canyon to motorized use in 2001, the canyon has undergone a

remarkable transformation. The canyon bottom has returned to its natural condition, with a

meandering stream and thick willows, cottonwoods and other riparian plants supporting a variety

of wildlife habitat. *Id.*; Exh. 8 at 5; Exh. 9 (BLM documenting regeneration); Exh. 4 at ¶ 12

(former BLM employee documenting restoration of Surprise Canyon). Indeed, the Inyo

California Towhee, a rare imperiled bird, reappeared in Surprise Canyon in 2004, approximately

three years after the canyon was closed, and a desert bighorn sheep herd has also returned to

parts of the canyon. Exh. 4 at ¶ 12; Exh. 3 at ¶ 10. The Canyon's dramatic recovery, however,

could be short-lived if it is again opened to motorized use – newly recovered cottonwoods,

willows and other vegetation could be destroyed, jeeps would again drive through the streambed

and over streambanks, and wrecked jeeps would likely again spill oils and other pollutants into

the river. Exh. 8 at 11-23 (listing damaging impacts from resumed vehicle travel up Surprise

Canyon). For these reasons, the Conservation Groups have actively participated in BLM's and

NPS's ongoing NEPA process regarding management of Surprise Canyon in an effort to

convince the agencies to make the motor vehicle closure permanent. *See* Exh. 16; Exh 1 ¶ 9;

Exh. 2 ¶ 8; Exh. 3 ¶ 6; Exh. 4 ¶ 10; Exh. 5 ¶¶ 8-9; Exh. 6 ¶¶ 9-10.

After BLM and NPS closed the route, jeep operators, including Plaintiffs, bought old

mining claims near Panamint City for one purpose – to attempt to take advantage of the

provision in the 2001 consent decree that could provide private inholders with motorized access

---

[3]    Subsequently, in a separate decision, Death Valley National Park closed the upper
portion of Surprise Canyon to motorized vehicle use in April 2002. *See* Exh. 9 at 1.

to the canyon despite the closure for other motorized vehicles.[4]  Soon after buying the old

mining claims, several of these individuals submitted letters to the BLM requesting a key to the

locked gate to drive their jeeps up the canyon.  *See* Exh. 9 at 1.  The BLM, however, determined

that such motorized vehicle access would cause significant resource damage to Surprise Canyon

and that denying the landowners of the Independence Millsite at Panamint City keys to the gate

was consistent with the provisions of the 2001 consent decree.  Exh. 9 at 2-3.  BLM informed

Plaintiffs that the only access to the property across BLM land was by hiking, pack animals, or

helicopter, and invited them to apply for a permit pursuant to the provisions of the Federal Land

and Policy Management Act (FLPMA) and its implementing regulations, if they wished BLM to

further consider their request for motorized vehicle access.  *Id*. at 3; *see* 43 C.F.R. §§ 2800 *et

seq*., § 2929; 36 C.F.R. § 14.

       Rather than apply for a FLPMA permit, Plaintiffs brought this lawsuit in an attempt to

undo the 2001 temporary closure and the consent decree.  Plaintiffs claim that the temporary

closure required by the 2001 settlement and consent decree is unlawfully denying them the right

to drive through Surprise Canyon, a right which they assert is guaranteed by a 19th Century right-

of-way law known as R.S. 2477.  *See, e.g.,* Complaint ¶¶ 7-8.  Plaintiffs seek a declaration that

Surprise Canyon is a public right-of-way acquired pursuant to that law.  *See id.* ¶¶ 95-104 (Quiet

Title Act claim, 28 U.S.C. §§ 1346(f) and 2409a); *id*. ¶¶ 105-110 (Declaratory Judgment Act

claim, 28 U.S.C. § 2201); *id*. ¶¶ 111-119 (writ of mandamus claim, 28 U.S.C. § 1361).  Such a

---

[4]     *See* Exh. 13 (Friends of Panamint Valley Discussion Forums, located at
http://forum.fopv.org/?m=323&f=2&p=1, last visited Nov. 8, 2006).  According to Plaintiff
Friends of Panamint Valley's website, the consent decree's exception "has prompted over 80
people to purchase land in Panamint City and request access to their property.  It was through
this process that Friends of Panamint Valley was born." Exh. 14 (www.fopv.org, last visited
Nov. 6, 2006).  Thus, Plaintiffs knew when they purchased the property that there was no public
motorized access to the canyon and bought the property in an effort to win access to which they
otherwise were plainly not entitled.

right-of-way, they claim, would permit them – and arguably the public – motor vehicle "access at all times" through Surprise Canyon, thereby overturning the current BLM and NPS closures (and the consent decree's provisions). *Id*. at ¶¶ 8, 135. Plaintiffs further seek the ability "to perform occasional routine maintenance" of the claimed route "without BLM or NPS approval or notification." *Id*. In addition to overturning the existing closure, such relief would undercut the process mandated by the consent decree in which BLM and NPS are supposed to consider the full range of management alternatives – including closure – for Surprise Canyon.

In addition, Plaintiff Bryan Lollich claims that the BLM has failed to act on his application for a permit pursuant to California Desert Protection Act (CDPA), Pub. L. No. 103-433; 108 Stat. 4471 (1994), and Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3210(b), to drive a jeep through Surprise Canyon. He alleges that BLM and NPS have a "nondiscretionary" duty to issue such a permit, and he thus seeks an order compelling the BLM to "immediately grant" him one. *Id*. at ¶¶ 9, 120-132 (Administrative Procedure Act claim, 5 U.S.C. § 706(1)). Such relief would run contrary to the agencies' discretion to condition and, if warranted, deny such access to protect the tremendous natural and recreational values of the canyon; values the Conservation Groups have long fought to protect.

## ARGUMENT

### I. THE CONSERVATION GROUPS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

Rule 24(a) of the Federal Rules of Civil Procedure provides that:

[u]pon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The D.C. Circuit applies the following four-part test to evaluate motions to intervene as-of-right: "(1) the timeliness of the motion; (2) whether the applicant 'claims an interest relating to the property or transaction which is the subject of the action'; (3) whether 'the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest'; and (4) whether 'the applicant's interest is adequately represented by existing parties.'" *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (citation omitted). In assessing these factors, the D.C. Circuit provides for "a liberal application in favor of permitting intervention." *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967).[5] Because the Conservation Groups satisfy each of Rule 24(a)'s requirements, they are entitled to intervene in this action as a matter of right.

### A. The Conservation Groups' Motion To Intervene Is Timely.

In determining whether an intervention motion is timely, courts in this circuit consider four factors: (1) the length of time the intervenors knew or should have known of their interest in the case; (2) the prejudice to the original parties resulting from the intervenors' delay; (3) the prejudice, if any, to the intervenors if the motion is denied; and (4) any unusual circumstances. *Stewart v. Rubin*, 948 F. Supp. 1077, 1103 (D.C. Cir. 1996).

Plaintiffs filed their complaint in this case on September 5, 2006, just two months ago. No answer has yet been filed by defendants, no orders have been issued by the Court, and no motions have been made by the parties. Because the Conservation Groups are filing the motion

---

[5]    *See also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (Rule 24 "is construed broadly in favor of the applicants"); *Federal Savings and Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993) ("[a]ny doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors"); *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992) (any doubts resolved in favor of intervention); *National Farm Lines v. ICC*, 564 F.2d 381, 384 (10th Cir. 1977) ("Our court has tended to follow a somewhat liberal line in allowing intervention.").

at such an early stage of this case, intervention will not delay the proceedings or prejudice the existing parties in any way.  Under these circumstances, the Conservation Groups' motion is "timely" within the meaning of Rule 24.  *Fund for Animals,* 322 F.3d at 735 (motion to intervene filed less than two months after complaint filed and before defendants filed an answer is timely); *Admiral Ins. Co. v. National Cas. Co. v. Nat'l Casualty Co.,* 137 F.R.D. 176, 177 (D.D.C. 1991) (motion to intervene was timely where "[t]he major substantive issues ... have not yet been argued or resolved, and the movants filed their motions promptly").

**B.      The Conservation Groups Have A Legally Protectable Interest In This Case.**

Rule 24(a)(2)'s requirement that an intervenor have an interest relating to the property or transaction which is the subject of the action "has been interpreted in broad terms" within the D.C. Circuit.  *Natural Resources Defense Council v. United States Envtl. Protection Agency*, 99 F.R.D. 607, 609 (D.D.C. 1983) ("*NRDC v. EPA*"); *Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 105 F.R.D. 106, 109 (D.D.C. 1985) ("attempts to interpret the rule narrowly" based on the interest test "have been repeatedly rejected in this jurisdiction"), *aff'd without opinion,* 784 F.2d 1131 (D.C. Cir. 1986).  Rather than being a significant barrier to intervention, the interest requirement is "a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) (quoting *Nuesse*, 385 F.2d at 700).[6]  As such, this Court examines "the 'practical consequences' of denying intervention, rather than … 'revert[ing] to a narrow formulation that 'interest' means 'a specific legal or equitable interest in the [case].'" *Independent Petrochemical Corp.*, 105 F.R.D. at 109 (quoting *Nuesse*, 385 F.2d at 700).

---

[6]      *See also Hodgson v. United Mine Workers of America,* 473 F.2d 118, 130 (D.C. Cir. 1972) ("The right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard.").

### 1. Conservation Groups Have an Undeniable Interest in Surprise Canyon.

The Conservation Groups and their members have long-standing recreational, aesthetic, scientific, historical, conservation, and professional interests in protecting Surprise Canyon. The Conservation Groups are all non-profit organizations whose missions embrace the protection of California's desert habitat, including Surprise Canyon. Each of the groups has a long history of involvement in the protection of these lands. *See, e.g.,* Exh. 1 at ¶¶ 7, 9-10; Exh. 2 at ¶¶ 4-7; Exh. 3 at ¶¶ 4-7; Exh. 4 at ¶¶ 3-10; Exh. 5 at ¶¶ 6-7; Exh. 6 at ¶ 7. For example, CWC, NPCA, and The Wilderness Society worked for years for the passage of the CDPA, which added the upper portion of Surprise Canyon to Death Valley National Park, and created the Surprise Canyon Wilderness in 1994. Exh. 5 at ¶ 6; Exh. 1 at ¶ 7; Exh. 6 at ¶ 7. The intensity of the Groups' interests is reflected in the fact that CBD, the Sierra Club, and PEER filed the lawsuit that caused the current closure to motor vehicles that Plaintiffs seek to undo.

The Conservation Groups continue to vigorously advocate for the protection of Surprise Canyon and the vehicle closure imposed by the consent decree. Exh. 1 at ¶ 9-10; Exh. 2 at ¶¶ 8-9; Exh. 3 at ¶ 7, 12; Exh. 4 at ¶ 10; Exh. 5 at ¶ 8; Exh. 6 at ¶ 9-10. In May 2002, CBD, PEER, CWC, and the Sierra Club submitted comments during to the BLM's NEPA process in which they urged the agency to permanently end motor vehicle use in the canyon. Exh. 16; Exh. 2 at ¶ 8; Exh. 3 at ¶ 6; Exh. 4 at ¶ 9; Exh. 5 at ¶ 8. Members of these Groups have also advocated for a permanent closure in meetings with agency employees, California's Senators, and through public tours, websites, and other publications designed to educate the public about the threats to the canyon. Exh. 1 at ¶ 9-10; Exh. 2 at ¶ 9; Exh. 3 at ¶ 7; Exh. 4 at ¶ 10; Exh. 5 at ¶ 10; Exh. 6 at ¶ 10.

In addition to working for years to protect Surprise Canyon, the groups' members have spent innumerable hours hiking, photographing, bird-watching, exploring, leading trips, doing restoration work, and enjoying the solitude, wildlife, and rare perennial stream in this desert canyon. Exh. 1 at ¶ 11; Exh. 2 at ¶¶ 10-12; Exh. 3 at ¶¶ 8-10, 14; Exh. 4 at ¶¶ 10-13; Exh. 5 at ¶ 11; Exh. 6 at ¶ 11. These members have aesthetic, scientific, recreational, professional, and spiritual interests in Surprise Canyon. Exh. 1 at ¶¶ 11-13; Exh. 2 at ¶¶ 10-13; Exh. 3 at ¶ 10; Exh. 4 at ¶ 13; Exh. 5 at ¶¶ 11-13; Exh. 6 at ¶¶ 11-12. Many of them have observed the damage that motor vehicles caused the area before the 2001 closure and have benefited from the restoration that has occurred since. Exh. 1 at ¶ 13; Exh. 2 at ¶ 11-12; Exh. 3 at ¶¶ 11, 13; Exh. 4 at ¶¶ 12-14; Exh. 5 at ¶ 13; Exh. 6 at ¶ 13. These interests easily meet Rule 24(a)'s interest requirement. *See Friends of Animals v. Kempthorne*, --- F. Supp. 2d ---, 2006 WL 2644914, *3-4 (D.D.C. Sep. 14, 2006) (groups' asserted interest in conserving, breeding, and hunting three wildlife species satisfies interest requirement).[7]

The Conservation Groups' interest in this litigation is especially clear because the instant case is a collateral attack on the consent decree's closure provision, which CBD, the Sierra Club, and PEER won through hard-fought litigation and negotiation. Exh. 2 at ¶ 5 (CBD member participated in negotiations leading to consent decree). Plaintiffs claim the closure is unlawfully preventing them from accessing their property via motorized vehicles over an alleged highway right-of-way, and seek a determination that such a right-of-way exists. Complaint at ¶ 7.

---

[7]    *See also San Juan County v. United States,* 420 F.3d 1197 (10th Cir. 2005) (*rehearing en banc pending)* (conservation group's use and enjoyment of canyon at issue and participation in efforts to protect canyon from motor vehicle use satisfies standing test); *Mausolf v. Babbitt,* 85 F.3d 1295, 1302-03 (9th Cir. 1996) (conservation group, seeking to intervene to defend an agency decision closing a national park to certain vehicle use, satisfies the interest requirement where it "has consistently demonstrated its interest in the Park's well-being … and has worked hard … to protect that interest").

Further, Plaintiff Lollich apparently alleges that the consent decree should be interpreted to require BLM to grant him a permit to access land in Panamint City by motor vehicle. Complaint at ¶ 56. Accordingly, Plaintiff Lollich's claim for a permit to access this property by motorized vehicle may require the interpretation of the consent decree obtained by CBD, the Sierra Club, and PEER. The Conservation Groups plainly have a substantial interest in defending and enforcing the closure required by the 2001 consent decree, in seeing the decree interpreted as narrowly as possible, and ensuring that the ecosystem of Surprise Canyon is not damaged by off-road vehicle use while the NEPA process is still pending. *See* Exh. 4 at ¶ 6-8 (PEER member helped prepare BLM's Environmental Assessment for the Surprise Canyon Interim Closure, and was the project manager for the Surprise Canyon NEPA analysis from 2002 to 2003 while he was a BLM employee). Where proposed intervenors seek to defend decisions they have won, they satisfy Rule 24(a)(2)'s interest requirement. *See NRDC v. EPA*, 99 F.R.D. at 609 (where proposed-intervenor industry sought decision that could be set aside by plaintiffs' lawsuit, court held interest requirement met).

> **2.      The Conservation Groups' Interests in Surprise Canyon Are Legally Protectable.**

An intervenor's interest in the litigation must be "legally protectable." *Tiffany Fine Arts v. United States*, 469 U.S. 310, 315 (1985). An interest is "legally protectable" when it is protected under *some* statute, contract, or common law principle, not necessarily the statute relied upon in the plaintiff's complaint. *Jones v. Pince George's County*, 348 F.3d 1014, 1018 (D.C. Cir. 2003) ("As the Rule's plain text indicates, intervenors of right need only an 'interest' in the litigation – not a 'cause of action' or 'permission to sue.'").[8]

---

[8]      Numerous courts have found irrelevant the fact that proposed intervenors' interests are not protected by the law under which the plaintiff sued. *See, e.g., Trbovich v. United Mine Workers*, 404 U.S. 528, 535-37 (1972) (holding party could intervene as a plaintiff

Here, the Conservation Groups' conservation and other interests in Surprise Canyon are plainly protected by public land management and environmental statutes. After all, their interests were sufficient to form the basis for the case *against* BLM under the Endangered Species Act that resulted in the *closure* of Surprise Canyon that Plaintiffs seek to undo here. Further, the Conservation Groups have legally protectable interests under at least three other laws implicated by plaintiffs' claims: (1) the California Desert Protection Act, which designated the Surprise Canyon Wilderness, and thus prohibited motor vehicle use in some areas through which the claimed highway runs (Pub. L. 103-433); (2) the Federal Land Policy and Management Act (FLPMA), which regulates right-of-way permits over BLM land and forbids "unnecessary or undue degradation" of BLM lands (*see* 43 U.S.C. §§ 1761-71 (governing rights-of-way) and *id.* at § 1732(b) (barring unnecessary or undue degradation)); and (3) the National Park Service Organic Act, which requires that Death Valley and other national parks be managed so as to "leave them unimpaired for the enjoyment of future generations"  16 U.S.C. § 1.[9]

---

even though it could not have filed suit under the statute relied upon by the original plaintiff); *Georgia v. Ashcroft*, 539 U.S. 461, 476-77 (2003) (upholding order allowing private citizens to intervene in Voting Rights Act preclearance case even though they could not have filed preclearance suit of their own and would not have been properly named as original defendants); *Arakaki v. Cayetano*, 324 F.3d 1078, 1084-85 (9th Cir. 2003) (interest qualifies under Rule 24(a) when it "is protectable under some law" and need not be "protected by the statute under which the litigation is brought"); *Georgia v. United States Army Corps of Engineers*, 302 F.3d 1242, 1251-53 (11th Cir. 2002) (looking beyond statute relied on by plaintiff to determine if proposed intervenors had legally protectable interest); *Solid Waste Agency of Northern Cook County v. United States Army Corps of Eng'rs*, 101 F.3d 503, 507 (7th Cir. 1996) ("The strongest case for intervention is … where the intervenor-aspirant has no claim against the defendant yet a legally protected interest that could be impaired by the suit. For it is here that intervention may be essential." (citation omitted)).

[9]    Intervention by conservation groups in cases where plaintiffs seek rights-of-way across public lands is not uncommon. *See, e.g., San Juan County,* 420 F.3d at 1207-10 (conservation group – which had worked for years to obtain a motor vehicle closure in a desert canyon – had a legally protectable interest in the Quiet Title Act litigation because the intervenor's interest "is not measured by the particular issue before the court but is instead measured by whether the interest the intervenor claims is *related to the property that is the*

C.    **The Relief Plaintiffs Seek May Impair The Conservation Groups' Interest In Surprise Canyon's Protection.**

In order to intervene, a party must demonstrate that the litigation "may as a practical matter impair or impede" the party's ability to to protect its interests.  Fed. R. Civ. P 24(a)(2).  As the Advisory Committee Notes for the 1966 Amendments to Rule 24(a) explain, "[i]f an absentee would be substantially affected in a *practical sense* by the determination made in an action, he should, as a general rule, be entitled to intervene."  (emphasis added).  In keeping with this direction, the D.C. Circuit has observed that the rule's emphasis on "practical disadvantage" was "designed to liberalize the right to intervene in federal actions."  *Nuesse*, 385 F.2d at 701-02.  *See also Fund for Animals,* 322 F.3d at 735 (rule looks to "practical consequences" of denying intervention) (citation omitted).

Plaintiffs' stated goal in bringing this case is to have Surprise Canyon declared a public highway under R.S. 2477 so that the canyon will once again be open to unrestricted motor vehicle use.  *See* Complaint ¶ 8 (plaintiffs seek motorized access "at all times" to Surprise Canyon and ability to perform "routine maintenance" to the route); ¶ 135 (Request for Relief, seeking same); *Fund for Animals,* 322 F.3d at 733, 735 (looking to relief sought by plaintiff to determine whether proposed intervenor had standing as well as whether interests would be impaired); *Huron Environmental Activist League v. U.S. Environmental Protection Agency*, 917

---

*subject of the action*.") (emphasis in original); *Southwest Four Wheel Drive Ass'n v. BLM*, 363 F.3d 1069 (10th Cir. 2004) (noting presence of intervenors in Quiet Title Act litigation involving status of routes under R.S. 2477); *United States v. Carpenter*, 298 F.3d 1122 (9th Cir. 2002) (order granting The Wilderness Society's motion to intervene as of right in a case involving Quiet Title Act claims concerning the status of a road on U.S. Forest Service land under R.S. 2477): *Park County v. United States*, 626 F.2d 718, 719 (9th Cir. 1980) (noting that "a local citizen organization[] was allowed to intervene as a party defendant" in a Quiet Title Act claim brought pursuant to R.S. 2477); *City & County of Denver v. Bergland,* 517 F. Supp. 155, 174-75 (D. Colo. 1981), *aff'd in part, rev'd in part,* 695 F.2d 465 (10th Cir. 1982) (granting intervention as of right to conservation groups and others where county sought right-of-way across Forest Service lands).

16

F.Supp. 34, 42-43 (D.D.C. 1996) (looking to relief sought by plaintiff to measure impairment to proposed intervenors' interests); *NRDC v. EPA*, 99 F.R.D. at 609 (same); *Utahns for Better Transp. v. United States Dep't of Transp.*, 295 F.3d 1111, 1116 (10th Cir. 2002) (same). As Plaintiffs recognize their complaint, such an outcome would undercut the vehicle closure that the Conservation Groups won in the consent decree. *See* Complaint ¶ 7 ("In or around 2001, the BLM closed the entrance to Surprise Canyon Road after a settlement to resolve litigation instigated by the Center for Biological Diversity. This closure has prevented [plaintiffs] from accessing their private property.")

The BLM has previously determined that *any* motorized use in Surprise Canyon will damage the canyon's fragile environment. *See* Exh. 8 at 23 (BLM recognition that motor vehicle use impacts "would all be considerably adverse" to the canyon's "outstandingly remarkable values."); *see also id. passim* (BLM analysis describing destruction of streamside vegetation, and harm to sensitive wildlife habitat, non-motorized recreation, and water quality from motor vehicle use in Surprise Canyon); Exh. 9 at 3 (BLM conclusion that the "outstandingly remarkable values of Surprise Canyon creek" would be "appreciably disturbed and damaged from vehicle use associated with landowner access"). As these agency documents make plain, if Plaintiffs succeed, the Groups' conservation interests – and the related interests of their members in experiencing the canyon for solitude, lush riparian vegetation, wild character, and bird and other wildlife species – may be substantially harmed by this litigation. Exh. 1 at ¶¶ 12-13; Exh. 2 at ¶¶ 11-13, 15; Exh. 3 at ¶¶ 11, 13; Exh. 4 at ¶ 14; Exh. 5 at ¶¶ 12-13; Exh. 6 at ¶ 12-13.

Finally, if Plaintiffs succeed in this litigation, it may be extremely difficult for the Conservation Groups to protect Surprise Canyon from damaging motor vehicle use. For example, if this Court determines that a right-of-way for a public highway exists pursuant to

R.S. 2477, rights will have passed to a non-federal entity, and some level of federal control on

that access may have been lost. [10]  Similarly, if Plaintiff Lollich succeeds in forcing BLM to

issue him an access permit, the resultant motorized use granted through that permit could

undermine the recovery of the riparian areas in Surprise Canyon, which only came about as the

result of the Conservation Groups' prior litigation.  *See Fund for Animals,* 322 F.3d at 735

("there is no question that the task of reestablishing the status quo if the [plaintiff] succeeds in

this case will be difficult and burdensome").  Without intervention, therefore, Plaintiffs'

significant interests in maintaining the Surprise Canyon closure and defending and enforcing the

consent decree will be injured.  Exh. 2 at ¶ 15; Exh. 3 at ¶ 15; Exh. 4 at ¶ 15; Exh. 6 at ¶ 9-10.

Courts recognize that intervention is appropriate where a plaintiff seeks to undo

protections won by proposed intervenors.  *See American Horse Protection Ass'n v. Veneman*,

200 F.R.D. 153, 158 (D.D.C. 2001) (intervention proper where outcome "would eviscerate the

[proposed intervenors'] efforts in creating" the challenged Plan); *Huron Environmental Activist

League*, 917 F.Supp. at 43 (injunctive relief sought by plaintiffs would "eviscerate" proposed

intervenors' "substantial work product"); *NRDC v. EPA,* 99 F.R.D. at 609-10 (allowing industry

to intervene in challenge to agency rule because intervenors participated in decision-making

_____

[10]    If a court determines that an R.S. 2477 right-of-way exists in Surprise Canyon as
Plaintiffs request, the agencies may be unable to maintain the current closure to motorized use.
While the BLM and NPS retain some authority to regulate vehicle traffic on R.S. 2477 rights-of-
way, the agencies may no longer have "the full range of management options," including
maintaining the vehicle closure, since a right-of-way, by definition, grants rights to use an
easement over another's property.  *See San Juan County,* 420 F.3d at 1210-11 & n. 7 (NPS
retains some regulatory authority over R.S. 2477 right-of-way, but perhaps not full range of
options).  For example, courts have held that right-of-way holders and the public may take
certain actions on R.S. 2477 rights-of-way without the federal land management agency's
approval, and that some right-of-way holder actions are exempt from NEPA.  *Southern Utah
Wilderness Alliance v. BLM,* 425 F.3d 735, 748-49 (10th Cir. 2005) (county may maintain R.S.
2477 right-of-way without notifying federal landowners); *Sierra Club v. Hodel,* 848 F.2d 1068,
1089-90 (10th Cir. 1988) (finding no major federal agency action where County construction
occurred within right-of-way).

process for rule); *Utah Ass'n of Counties,* 255 F.3d at 1253-54 (where relief plaintiffs sought could result in reduced environmental protection of national monument in which conservation groups had interest, groups' interests held impaired); *Mausolf,* 85 F.3d at 1302-03.[11]

    **D.**    **The Conservation Groups' Interests May Not Be Adequately Represented by Existing Parties.**

    Finally, an applicant for intervention as a matter of right must show that its interests may not be adequately represented by the existing parties to the litigation. The inadequate representation prong of the intervention test "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n.10 (1972). *See also Fund for Animals,* 322 F.3d at 735 (requirement is "not onerous") (citation

---

[11]    Because the tests for intervention and Article III standing are closely related, the Conservation Groups satisfy any standing requirements. The D.C. Circuit has concluded that "any person who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 233 (D.C. Cir. 2003). By the same token, a finding that proposed intervenors have standing "is alone sufficient to establish that the [Applicants have] 'an interest relating to the property or transaction which is the subject of the action." *Fund for Animals,* 322 F.3d at 735; *American Horse Protection Ass'n,* 200 F.R.D. at 157 ("it is impossible to conjure a case in which an intervenor would have constitutional standing to intervene but not have a sufficient 'interest in the litigation' to justify intervention under Fed. R. Civ. P. 24(a)(2)").

    To demonstrate standing in this case, the Conservation Groups must show (1) that they will be injured if Plaintiffs prevail in their stated goal of re-opening Surprise Canyon to motor vehicle use; (2) that this injury would be caused by an adverse court decision; and (3) that the injury would be prevented if the government's position is upheld. *See American Horse Protection Ass'n,* 200 F.R.D. at 156 (explaining standing test when intervening to defend agency decision). The Supreme Court has long recognized that interests such as the use and enjoyment of public lands that the Conservation Groups' members show here establish standing where an action threatens those interests. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."). Further, the Conservation Groups have benefited from the 2001 closure, and their environmental, recreational, aesthetic, and professional interests in the canyon will be significantly harmed if Plaintiffs are successful in gaining motor vehicle access. This injury could be avoided by a favorable decision.

omitted).  Under this lenient approach, representation may be inadequate where the interests of

the party seeking intervention and those of the existing party are "different," even if they are not

"wholly 'adverse,'" *Nuesse*, 385 F.2d at 703, or where they are "similar but not identical,"

*United States v. American Tel. & Tel. Co.,* 642 F.2d 1285, 1293 (D.C. Cir. 1980) (applicant

"'ordinarily should be allowed to intervene unless it is clear that the party will provide adequate

representation for the absentee,'" citing 7A C. Wright & A. Miller, Federal Practice &

Procedure: Civil s 1909, at 524 (1972)).  Even when a potential intervenor seeks the same legal

result as another party, intervention is appropriate when the objectives of the parties may

diverge.  *Fund for Animals*, 322 F.3d at 737 ("even 'a shared general agreement . . . does not

necessarily ensure agreement in all particular respects'"); *San Juan County,* 420 F.3d at 1213.

    The D.C. Circuit has repeatedly recognized that governmental representation of private,

non-governmental intervenors may be inadequate.  For example, in *Dimond v. District of

Columbia,* 792 F.2d 179, 192 (D.C. Cir. 1986), the court held that because the government was

responsible for representing a broad range of public interests rather than the more narrow

interests of the private intervenors, the "application for intervention . . . falls squarely within the

relatively large class of cases in this circuit recognizing the inadequacy of governmental

representation of the interest of private parties in certain circumstances."[12]

---

[12]    *See also Natural Resources Defense Council v. Costle,* 561 F.2d 904, 912-13
(D.C. Cir. 1977) (contrasting government agency's "broad concern[]" in implementing
settlement agreement with more narrow focus of industry proposed intervenor); *Utah Ass'n of
Counties,* 255 F.3d at 1255-56 ("the government's representation of the public interest generally
cannot be assumed to be identical to the individual parochial interest of a particular member of
the public merely because both entities occupy the same posture in the litigation"); *Mausolf*, 85
F.3d at 1303 ("[w]hen managing and regulating public lands, to avoid what economists call the
'tragedy of the commons,' the Government must inevitably favor certain uses over others. . .
[e]ven the government cannot always adequately represent conflicting interests at the same
time").

The history of BLM and NPS's management of Surprise Canyon demonstrates that the agencies may not adequately represent the Conservation Groups' singular goal of maintaining the Surprise Canyon motor vehicle closure and protecting this rare riparian area. Most obviously, despite the damage jeeps caused in Surprise Canyon for more than a decade, and despite the fact that such use by jeeps was violating the Wilderness Act, the BLM closed the canyon to motor vehicles only after CBD, the Sierra Club, and PEER filed a suit against the agency. Indeed, far from protecting this canyon before the lawsuit or enforcing the prohibition on motor vehicles in the Surprise Canyon Wilderness, the BLM permitted motor vehicle use and even granted annual permits to four-wheel drive organizations for large jeep events in the canyon. Exh. 7 at 10-11. *See Mausolf*, 85 F.3d at 1303 (8th Cir. 1996) (conservation groups not adequately represented in lawsuit brought by snowmobile organization when "in the past, the Government has waived and failed to enforce regulations against snowmobile use" in a national park). The BLM allowed motor vehicle use throughout the 1990s despite the agency's and the public's concerns about the damage jeeps were causing in the canyon. Exh. 4 at ¶ 5. According to Jeffrey Aardahl, a former BLM and Death Valley National Park employee and current PEER member, the BLM also failed to fulfill its commitment to monitor the impacts to ensure there would be no damage. *Id*. By the time the BLM was forced to close Surprise Canyon by the 2001 consent decree, the agency admitted that the canyon failed to meet standards "for a properly functioning riparian system due to the effects of vehicle use." Exh. 7 at 12. Conservation Groups should not be expected to rely upon BLM and NPS to defend an action that BLM adopted only at the point of the Group's litigation dagger. *See Coalition of AZ../N.M. Counties for Stable Growth v. U.S. Dep't of Interior,* 100 F.3d 837, 845-46 (10th Cir. 1996) (history of prior litigation between government and applicant one factor in determining

government may not represent applicant's interest); *Mausolf*, 85 F.3d at 1303 (same). *See also* Exh. 4 at ¶ 4 (former BLM employee indicating that BLM unlikely to adequately represent Conservation Groups); Exh. 2 at ¶ 5 (experience as CBD's representative in negotiations for 2001 consent decree "led me to believe that BLM and the Department of Interior did not then, and had not historically, represented [CBD's] interests"); Exh. 3 at ¶ 12 (experience in meetings with agency personnel for Surprise Canyon NEPA process suggests agencies may allow jeep access despite environmental consequences).

Further, the BLM and NPS must consider a multitude of different interests, including those of off-road vehicle and jeep advocates, while the Conservation Groups represent a specific group of people who are narrowly interested in maintaining the Surprise Canyon closure in order to protect the canyon's natural resources from motorized vehicle damage. *See, e.g.,* 43 U.S.C. § 1701(a)(8) (BLM lands should be managed to provide for a variety of uses, including outdoor recreation); § 1712(c)(1) (requiring BLM lands be managed under the principle of "multiple use"); *Southern Utah Wilderness Alliance v. Norton,* 2002 WL 32617198, *5 (D.D.C. June 28, 2002) (citing allegation that BLM must represent a "broad public interest"). In determining its litigation and settlement positions, the BLM and NPS must consider the Conservation Groups' input and views – but they will not be the only interests the agencies must weigh. For example, the agencies are apparently considering numerous options for the outcome of the NEPA process regarding Surprise Canyon, ranging from closure to unlimited motor vehicle access. Exh. 15 (Friends of the Panamint Valley, Surprise Canyon, The Battle Wages On, http://www.fopv.org/article1.html, last visited November 3, 2006). Accordingly, the Conservation Groups' narrow interests in maintaining the Surprise Canyon closure may not be adequately represented. *See Friends of Animals,* 2006 WL 2644914, *5 (contrasting interests of

proposed intervenor conservation and hunting groups (who represent their members) with those of a federal agency (whose obligation "is to represent the interests of the American people"), and finding that agency could not adequately represent interests of proposed intervenors); *People for the Ethical Treatment of Animals v. Babbitt,* 151 F.R.D. 6, 14 (D.D.C. 1993) (because U.S. Fish and Wildlife Service "has a mandate to design and enforce an entire regulatory system in the public interest" and potential intervenor has interest only in preventing revocation of a single permit, government does not adequately represent intervenor); *Southern Utah Wilderness Alliance,* 2002 WL 32617198, *5 (BLM will not adequately represent specific interests of lessee of two challenged mineral leases on BLM land).

## II.    IN THE ALTERNATIVE, THE CONSERVATION GROUPS MEET THE TEST FOR PERMISSIVE INTERVENTION UNDER RULE 24(b).

If this Court denies the Conservation Groups intervention as-of-right, the Conservation Groups request that the Court grant them permissive intervention under Rule 24(b).  That rule provides that:

> Upon timely application anyone may be permitted to intervene in an action. . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b)(2).

Courts in this Circuit have recognized that permissive intervention may be granted when: (1) the motion is timely; (2) the applicant's claim or defense has a question of law or fact in common with the existing action; and (3) intervention will not delay or prejudice the adjudication of the rights of the original parties.  *See, e.g., Bossier Parish School Bd. v. Reno,* 157 F.R.D. 133 (D.D.C. 1994).  Like intervention of right, permissive intervention is to be granted liberally.  *See* 7C Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice And Procedure § 1904 (1986).

The Conservation Groups meet all of the prerequisites for permissive intervention.  As set out above, the motion to intervene is timely and will not prejudice the rights of the existing parties.  Additionally, because the Conservation Groups seek to defend the Surprise Canyon closure to motor vehicles challenged by Plaintiffs, the Conservation Groups' claims and defenses share substantial questions of law and fact with the main action.  Thus, even if this Court denies the Conservation Groups intervention as a matter of right, it should grant the Groups permissive intervention.

## CONCLUSION

For the reasons set forth above, the Conservation Groups respectfully request that they be granted intervention as-of-right.  Alternatively, the Conservation Groups ask that they be granted permissive intervention.

Respectfully submitted this 8th day of November, 2006.


  s/ James S. Angell_____
James S. Angell (D.C. Bar # 460285)
Edward B. Zukoski (motion for admission *pro hac vice* filed concurrently)
McCrystie Adams (motion for admission *pro hac vice* filed concurrently)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
Telephone:  (303) 623-9466

Attorneys for Proposed Defendant-Intervenors


Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
1095 Market St., Suite 511
San Francisco, CA 94103
Telephone: (415) 436-9682 x 307
Email: lbelenky@biologicaldiversity.org

Attorneys for Proposed Defendant-Intervenors Center for Biological Diversity, Public Employees for Environmental Responsibility, and Sierra Club

# TABLE OF EXHIBITS

Exhibit 1.    Declaration of Howard P. Gross

Exhibit 2.    Declaration of Daniel R. Patterson

Exhibit 3.    Declaration of Thomas Standish Budlong

Exhibit 4.    Declaration of Jeffrey B. Aardahl

Exhibit 5.    Declaration of Jason L. Fried

Exhibit 6.    Declaration of Geary W. Hund

Exhibit 7.    Bureau of Land Management, Environmental Assessment for the Proposed Interim Closure of Surprise Canyon Route P71 (May 23, 2001)

Exhibit 8.    Bureau of Land Management, Supplement to the Environmental Assessment for the Proposed Interim Closure of Surprise Canyon Route P71 (Sep. 29, 2003)

Exhibit 9.    Bureau of Land Management, Decision Record for Private Property Access Request to the Independence Millsite, Inyo County, California (Oct. 24, 2003)

Exhibit 10.    Letter of Sens. Dianne Feinstein and Barbara Boxer to Mike Pool, California State Director, Bureau of Land Management *et al*. (Dec. 2, 2005)

Exhibit 11.    *Center for Biological Diversity v. Bureau of Land Management*, C-00-0927 (JCS) (N.D. Ca.), Stipulation and Proposed Order Concerning All Further Injunctive Relief (Jan. 2001)

Exhibit 12.    *Center for Biological Diversity v. Bureau of Land Management*, C-00-0927 (JCS) (N.D. Ca.), Judgment (Mar. 20, 2001)

Exhibit 13.    Friends of Panamint Valley Discussion Forums, http://forum.fopv.org/?m=323&f=2&p=1, last visited Nov. 8, 2006

Exhibit 14.    Friends of Panamint Valley website, www.fopv.org, last visited Nov. 6, 2006

Exhibit 15.    Friends of the Panamint Valleywebsite, Surprise Canyon, The Battle Wages On, http://www.fopv.org/article1.html, last visited Nov. 3, 2006

Exhibit 16.    Letter of Daniel R. Patterson, Center for Biological Diversity, to Hector Villalobos, Bureau of Land Management (Oct. 2, 2002)